# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KELLY JO MULLINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-0144-NE** |
| | ) | |
| **GATES CLEANERS, INC., and** | ) | |
| **COLLINS OMODUE,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

In this action, plaintiff, Kelly Mullins, asserts claims against her former employer, Gates Cleaners, Inc. ("Gates"), under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, for discrimination on the basis of her sex by allegedly subjecting her to a hostile work environment and constructively discharging her by failing to remedy sexual harassment she allegedly suffered at the hands of a co-employee:  the other defendant in this action, Collins Omodue ("Omodue").[1]  She also asserts supplemental state law claims against both defendants for assault and battery,[2] tortious invasion of privacy,[3] outrageous conduct,[4] and a further claim against defendant Gates for negligent or wanton hiring, training,

---

[1] Doc. no. 5 (Plaintiff's Second Amended Complaint).

[2] *Id.* ¶¶ 35-40.

[3] *Id.* ¶¶ 41-46.

[4] *Id.* ¶¶ 47-52.

supervision, and retention.[5]

The case is before the court on Gates' motion for summary judgment as to all of the claims asserted against it,[6] and Gates' "motion to strike in whole or in part or in the alternative limiting" the use of most of the changes in plaintiff's errata sheet and amendments to her deposition testimony.[7]  Upon consideration of the pleadings, the briefs in support of and in opposition to these motions, and the evidentiary material submitted by both parties, the court concludes that the motion to strike is due to be denied and the motion for summary judgment due to be denied in part and granted in part for the reasons stated herein.

# I.  STATEMENT OF FACTS

Gates Cleaners, Inc., is a laundry and dry-cleaning business in Huntsville, Alabama.[8]  Gates has employed Omodue for seventeen years.[9]  Gates hired plaintiff, Kerry Mullins, in April of 2006, as part of a prison work-release program, and she remained an employee until she submitted her letter of resignation on January 31,

---

[5] *Id.* ¶¶ 53-57.

[6] Doc. no. 24.

[7] Doc. no. 23.

[8] Doc. no.26, Ex. A (Deposition of Richard D. Bibb) [hereinafter Bibb Deposition], Ex. 4 (Defendant's Answers to Plaintiff's Interrogatories), at 3. At the summary judgment stage, the court must "recount the facts in the light most favorable to . . . the non-moving party." *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003).  "For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts." *Id.  See also, e.g.*, *Matthews v. Crosby*, 480 F.3d 1265, 1269 (11th Cir. 2007) (same).

[9] Doc. no. 26, Ex. C (Deposition of Collins Omodue), at 13 [hereinafter Omodue Deposition].

2008.[10]

During the period that plaintiff worked at Gates, the company's sexual harassment policy consisted of a poster, initially posted at the back of the facility above a water fountain[11] and, thereafter, posted on a cubicle near the center of the facility.[12]  The poster defined sexual harassment, provided examples of conduct that might constitute sexual harassment, and listed a "designated" supervisor  as part of "your employer's complaint system."[13]  According to the poster, the individual "[t]his employer[, namely Gates,] has designated . . . as the person in charge of handling sexual harassment complaints" was, until at least late 2007, Jim Shockley, the manager of operations at Gates.[14]  Jim Shockley suffered a debilitating stroke on November 27, 2007.[15]  Subsequently, his wife Debra Shockley assumed his position as manager and, at some point thereafter, Ms. Shockley's name replaced her

---

[10] Doc. no. 26, Ex. B (Deposition of Kelly Jo Mullins), at 13, 112 [hereinafter Mullins Deposition]; doc. no. 5, ¶ 13.

[11] Bibb Deposition, at 23-24; doc. no. 26, Ex. E (Deposition of Peggy Newland), at 18 [hereinafter Newland Deposition].

[12] Bibb Deposition, at 21-23; doc. no. 26, Ex. D (Deposition of Debra M. Shockley), at 30 [hereinafter Shockley Deposition].

[13] *See, e.g.*, Shockley Deposition, at 30-31; Shockley Deposition, Plaintiff's Ex. 4 (Gates' Sexual Harassment Poster).  The copy of the poster provided as plaintiff's Exhibit 4 to the Shockley Deposition lists Debra Shockley's name as the person to whom claims were to be brought.  *Id.* Debra Shockley testified that her name was placed on the poster "sometime in '08 . . . ." Shockley Deposition, at 31.

[14] Shockely Deposition, Plaintiff's Ex. 4; Bibb Deposition, at 26.

[15] Shockley Deposition, at 15.

husband's as the designated supervisor to whom sexual harassment complaints were to be made according to Gates policy.[16]

Sometime during the year preceding plaintiff's complaint, another Gates employee, Peggy Newland ("Newland"), had lodged a formal complaint about Collins Omodue.  According to Newland she "was walking back towards the front of the drycleaning machines, and [Omodue] just came up to me and grabbed me and was pushing me back towards the machines, and he was grabbing me by my breast and saying, 'let me see 'em, let me see 'em.'"[17]  Another employee intervened.[18]  Newland then went to Jim Shockley's office and told him about the incident.  Newland wrote a description of Omodue's conduct on a sheet from a legal pad, at Shockley's direction, to go "into [Newland's] file."[19]  Shockley called Omodue into his office and, in Newland's presence, warned Omodue not to verbally or physically harass Newland again and stated that, if Omodue did, he would be fired.[20]  Other female employees complained amongst themselves about Omodue's verbal and physical behavior towards themselves or one another, and some believed that Gates'

---

[16] *Id.* at 30-31.

[17] Newland Deposition, at 14; *see also* doc. no. 26, Ex. F, (Deposition of Barbara Brewer), at 23 [hereinafter Brewer Deposition].

[18] *Id.* at 16.

[19] *Id.* at 17.

[20] *Id.* at 16-19.

4

supervisors were aware of that behavior.[21]

Plaintiff testified in her deposition that, at some point in January 2007, Omodue

began making sexually suggestive comments to her:

A [plaintiff]:  It was in January.  Around January of 2007.

Q [Gates' counsel]:  Tell me what he did.

A:  He was verbally asking me would I have his baby, asking me would
I go to Atlanta or somewhere with him on the weekends, tell me I had
a nice butt, talking about my boobs.

Q:  Tell me exactly what he said.

A:  He said I had a nice ass on me, and I had a pretty set of breasts.[22]

Following that incident, plaintiff went to Jim Shockley and filled out a written

complaint.[23]   Plaintiff was moved to a different unit within the facility.[24]   There

followed a period of unspecified length during which there were no additional

incidents.[25]  Some time thereafter, however, Omodue grabbed plaintiff on the buttocks

as the employees were preparing to go to break.[26]  Following that incident, plaintiff

---

[21] Doc. no. 33, Ex. 1 (Deposition of Carolyn A. Black), at 15-26.

[22] Mullins Deposition, at 56.  This court "do[es] not explicate this vulgar language lightly, but only because its full consideration is essential to measure whether these words and this conduct could be read has having created 'an environment that a reasonable person would find hostile or abusive.'" *Reeves v. C.H. Robinson, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010) (*en banc*) (quoting *Oncale v. Sundowner Offshore Sers., Inc.*, 523 U.S. 75, 81 (1998)).

[23] Mullins Deposition, at 59.

[24] *Id.*

[25] *Id.* at 61-62.

[26] *Id.* at 62-64.

testified that she again filed a written complaint with Jim Shockley, and that she was moved again, this time into an area surrounded by several shirt presses called "the hole."[27]

While plaintiff is unable to provide an accurate chronology of the events that transpired during the period that followed, she has provided a laundry list of sexually suggestive and vulgar comments she testifies Omodue made to her "all the time."[28] In a handwritten addendum to her deposition, plaintiff described twenty-eight verbal comments, including the following:[29] comments about her "breast[s]" and "ass," "that he would like to see [her] body without [her] clothes," that "he wanted to f___" her, that he would love to see himself "between [her] legs," that he wanted to see her "in his bed fuc____ him," that he "would like to see [her] pink p____," and that "he wanted [her] to have his baby."[30]  At another point, when a group of employees went

---

[27] *Id.*

[28] Mullins Deposition, at 65.

[29] This document is a part of the deposition errata sheet that is the subject of Gates' motion to strike.  Doc. no. 23.  Part III.A of this memorandum opinion denies in full defendant's motion to strike and, as a consequence, the statements contained in the errata sheet are, here, included as facts. As previously noted, however, "what [is] set out in this opinion as 'the facts' for summary judgment purposes may not be the actual facts."  *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003). Defendants are by no means prohibited from impeaching plaintiff on the basis of her failure to elucidate these instances of alleged verbal harassment during her actual deposition.

[30]  Doc. no. 23, Ex. 2 (Errata Sheet to Mullins Deposition), at 4-5 [hereinafter Mullins Deposition Amendment].  The same document is attached, though without page numbers, near the end of Mullins' Deposition filed as part of defendant's evidentiary submissions.  Doc. no. 26, Ex. B.  For the sake of the clarity afforded by page numbering, this memorandum opinion will refer to the copy of this document appended to defendant's motion to strike, doc. no. 23.

to a nearby Baskin-Robbins ice cream parlor, Omodue asked plaintiff "[w]hat would you do for a quart of ice cream," and plaintiff asserts that the comment "was [intended] sexually."[31]

Within one to two weeks of the incident at Baskin-Robbins, Omodue "popped" plaintiff on her posterior in the presence of Newland.[32]  Plaintiff "filled out another complaint," but Newland "told [her] that it wouldn't do no good."[33]  She also once again spoke with Jim Shockley, and he "moved [her] again."[34]  Plaintiff has presented evidence that there may have been one further incident not long thereafter about which she filled out a written complaint not long thereafter, but it is not entirely clear from the record what the details of that incident were.[35]  In any event, at some point after the foregoing incidents, Omodue was standing outside of the facility's restroom near the sink and told plaintiff that he "love[d] seeing [her] body when it's sweaty like that."[36]  Plaintiff testified that she believed a supervisor spoke with Omodue about his behavior at some point,[37] and there was a respite from the harassment.[38]

---

[31] Mullins Deposition, at 66-67.

[32] *Id.* at 67-68.

[33] *Id.*

[34] *Id.* at 68-69.

[35] *See id.* at 70-72 ("There was another one because I made two complaints with Peggy. I filled out two.").

[36] Mullins Deposition, at 76-77.

[37] *Id.* at 82-83.

[38] *Id.*

In January of 2008, Omodue "started to get where he was very verbal."[39]  At some point, apparently during that month, Omodue "cornered" plaintiff and "told [her] that he wanted to take [her] to his house."[40]  During this incident, plaintiff testified that Omodue gave her the address to his house and said "he wanted to take [her] home and bang [her], so him and his wife could raise another baby. That he always wanted a mixed [race] baby."[41]  On January 18, 2008, Omodue either "popped" or grabbed plaintiff's buttocks, and, once again, she filled out a written complaint.[42]  On January 21, 2008, there is evidence that Omodue again grabbed plaintiff on the buttocks.[43]

Plaintiff has indicated that there were incidents on both January 23 and 24, 2008.  There is sufficient evidence in the record from which a reaspmab;e [erspm could infer the existence of two incidents,[44] though not to determine precisely what happened on which day.  Plaintiff has, nevertheless , provided evidence that, on either January 23 or 24, she was returning from a meal with her husband and, while she was

---

[39] *Id.*

[40] *Id.* at 83.

[41] Mullins Deposition, at 83-84.

[42] Mullins Deposition, at 111-12, 125-26.

[43] *See* Mullins Deposition, Defendant's Ex. 13 (Police Report); *see also* Mullins Deposition, at 111-12.

[44] *See infra*, part III.A (discussing the attempted clarifications in Mullins Deposition Amendment).

8

coming in the back door of Gates' facility, she encountered Omodue.[45] She attempted to go around him, but he grabbed her and shoved her up against a wall.[46]  Omodue then began "putting his hands all over" plaintiff,[47] grabbing her on her breasts and between her legs.[48]  Plaintiff shoved Omodue away from her[49] and immediately went to the front supervisor, Barbara Brewer.[50]  Brewer told plaintiff to write out a complaint, which she did on a sheet from a legal pad.[51]  Brewer also called Debra Shockley, who was not at the facility on the day of the incident, but who had, by this point, assumed the management duties previously shouldered by her husband.[52] Shockley, in turn, called the president of the company, Richard Bibb,[53] who interviewed several employees about the incident.[54]  Brewer also took statements from Omodue and another employee, Julio Barrera, both of whom contended that the incident had not occurred as plaintiff described it.[55]

---

[45] Mullins Deposition, at 89, 83.

[46] *Id.* at 93.

[47] *Id.* at 89, 91, 93-94.

[48] *Id.*; *see also id.* at 115-17; Brewer Deposition at 20-21.

[49] Mullins Deposition, at 94.

[50] *Id.* at 115-16.

[51] *Id.* at 89-90.

[52] Brewer Deposition, at 18.

[53] Bibb Deposition, at 9; Shockley Deposition, at 22.

[54] Bibb Deposition, at 53.

[55] Brewer Deposition, Plaintiff's Ex. 4; Brewer Deposition, at 28, 31.

Plaintiff left the facility shortly after filing her report.[56]  Either on the same day

that incident occurred,[57] or the following day,[58] she went to the Huntsville Police

Department and filed a report.[59]  Plaintiff did not return to work until January 28.[60]

That day, she spoke with Bibb, who told her that he had told Omodue to stay twenty

feet away from plaintiff.[61]  Plaintiff asked if that was all Bibb  was going to do,[62] and

Bibb responded that all he could do was try to keep the two of them separated.[63]

> I told him that I had done made four or five complaints on Collins
> [Omodue] for harassing me.  I told him that Jim had done moved me
> four or five times, because that was his idea, to move me or to move
> him.  And I told Mr. Bibb, I said, "That's not working. I have been
> moved four or five different times because of the same reason."  And he
> said, "Well, that's all he was going to do was to try to separate us."  And
> I told him that wasn't good enough.  That I was tired of coming to work
> and getting harassed and touched and felt on and everything else, and
> that I couldn't do that.  I couldn't do it.  That was supposed to be the

---

[56] Mullins Deposition, at 90.

[57] *Id.* at 133-34.

[58] *Compare* Mullins Deposition Amendment, at 3-4, *with* Mullins Deposition, at 86-89 (in which plaintiff appears confused about the timing of the police report).  There is a great deal of confusion in the record — especially within Mullins' Deposition itself — about the date on which the incident occurred relative to the date on which the police report was filed. *E.g.*, 86-89, 94-95, 106-112 ("I can't give you the exact dates.")

[59] Mullins Deposition, Defendant's Ex. 13.

[60] Mullins Deposition, at 96.

[61] *Id.* at 99.

[62] *Id.*; *see also* Bibb Deposition, at 45 ("I said, Kelly, I don't know exactly what happened, but I'm going to investigate and get to the bottom of it. I said, but in the mean time, I have told Collins to stay twenty feet from you and not to talk to you, and I want you to do the stay [sic], stay twenty feet from Collins and do not talk to him until I've talked to everybody.  Her answer was, that's not good enough.").

[63] Mullins Deposition, at 99;

resolvement [sic] of everyone of them:  to move me, to move me, to move me.[64]

Following this conversation, plaintiff left Gates, went to her sister's house, and wrote her letter of resignation.[65]  She returned to work, however, on January 30, and worked a full shift.[66]  Nonetheless, on January 31, 2008, she turned in her letter of resignation, terminating her employment relationship with Gates.[67]

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Chapman*

---

[64] *Id.* at 97.

[65] *Id.* at 97, 113-15.

[66] *Id.* at 97, 102.

[67] *Id.* at 113.

*v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

However, at this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The proper question is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.  In making this determination, the evidence and facts inferred therefrom "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.* 475 U.S. 574, 587-588 (1986) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

## III.  DISCUSSION

**A.     Gates' Motion to Strike Plaintiff's Deposition Errata Sheet.**

As a preliminary matter, it is necessary for this court to address Gates' motion to strike plaintiff's errata sheet.[68]  Defendants deposed plaintiff on July 15, 2009.[69]  Plaintiff executed and signed an errata sheet pursuant to Federal Rule of Civil Procedure 30(e) on October 7, 2009, in which she proposed fourteen changes or "clarifications" to her testimony.[70]  Nearly three months later, after discovery had closed and simultaneously with their motion for summary judgment, defendants moved to strike most of the alterations made in the errata sheet or, in the alternative,

---

[68] Doc. no. 23.

[69] *See generally* Mullins Desposition, doc. no. 26, Ex. B.

[70] *See* Mullins Deposition Amendment, doc. no. 23, Ex. 2.

to limit its use at trial.[71]

The first proposed change in plaintiff's "AMENDMENT TO DEPOSITION" incorporates, by reference, a two-page, handwritten exhibit appended thereto entitled "Things Collins has Said," in which plaintiff outlines multiple incidents of verbal harassment to which she claims to have been subjected.[72]   At least six of the remaining thirteen changes purport to clarify exactly to which incident of alleged physical harassment certain of plaintiff's deposition statements refer, asserting that "[t]here were two incidents, one on the 23rd [of January] and one on the 24th [of January]."[73]  Gates asserts that these portions of plaintiff's errata sheet are "wholesale changes" that "contradict her answers to clear and unambiguous questions during her deposition testimony."[74]  They denounce the errata sheet as an attempt to create "two incidents" from what they claim is clearly one in the deposition testimony, and to add "more than five times the number of verbal allegations of harassment."[75]   Gates

---

[71] Even with careful reading, it is not entirely clear from the text of Gates' motion what relief it seeks.  The motion is styled as one "TO STRIKE IN WHOLE OR IN PART OR LIMIT IN THE ALTERNATIVE," yet when defendant requests specific relief in the prayer, no mention appears of striking the deposition errata sheet in whole.  *Compare* doc. no. 16, at 1, *with id.* at 16.  However, as it makes no difference to the determination whether the broader or narrower relief is what Gates actually seeks, this court will address the motion according to its terms, rather than its heading.

[72] Mullins Deposition Amendment, at 2, 4-5.  The last two pages retain the label of Exhibit A.

[73] *Id.* at 3.

[74] Doc. no. 23, at 1-2.

[75] Doc. no. 23, at 11, 14.

contends that these portions of the errata sheet should be stricken from the record and, of greatest tactical significance, should not be considered for purposes of their motion for summary judgment.[76]

Rule 30(e) permits a deponent, provided she meets certain procedural requirements,[77] "(a) to review the transcript or recording [of a deposition]; and (b) if there are *changes in form or substance*, to sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1) (emphasis supplied). Courts are divided on whether there are limitations to the *substantive changes* that can be made to a deposition pursuant to this provision. Plaintiff correctly notes that the majority of courts (at least historically) have read the language of the rule neither to set "limitations on the type of changes to be made," nor to "require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons of the changes — even if those reasons are unconvincing." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997) (quoting *Lugtig v. Thomas*, 89 F.R.D. 639, 641 (N.D. Ill. 1981)

---

[76] Doc. no. 23, at 16; *see also* doc. no. 25, at 15 n.11.

[77] The rule contains two mandatory procedural requirements: (1) the deponent's *explicit* reservation of the right to review the transcript, and (2) the deponent's completion of her errata sheet within 30 days of notification that the transcript or recording of her deposition is available. Fed. R. Civ. P. 30(e); s*ee also*, *EBC, Inc. v. Clark Building Sys., Inc.*, No. 09-1182, 2010 WL 3239475, *7-8 (3d Cir. Aug. 18, 2010) ("The procedural requirements of Rule 30(e) are clear and mandatory."). It is far from clear in the record whether plaintiff satisfied these requirements. Nonetheless, defendant has failed to advance any argument on the basis of either potential shortcoming and, consequently, those arguments are deemed waived.

(internal alterations omitted); *see also, e.g.*, *Bartons v. Pennsylvania*, No. 1:08-CV-0366, 2010 WL 1657284, at *5 (M.D. Pa. Apr. 23, 2010) (stating that "the majority of tribunals to have addressed Rule 30(e) generally permit deponents to amend the content of their testimony"); *Lamarche v. Metropolitan Life Insurance Co.*, 236 F. Supp. 2d 34, 41 (D. Me. 2002) (permitting all substantive changes, provided deponent met the procedural requirement of giving some reason); *Foutz v. Town of Vinton*, 211 F.R.D. 293, 294-95 (W.D. Va. 2002) (citing seven cases for the "better reasoned" view that Rule 30(e) does not limit the types of changes a deponent may make to her deposition transcript). These courts note that the plain language of the rule permits alterations to "substance" with no apparent limitation, and that, since the original answers in a deposition remain available to the deposing party for impeachment or otherwise, any potential prejudice from broadly permitting changes under Rule 30(e) is minimal. *E.g.*, *Foutz*, 211 F.R.D. at 295.

On the other hand, the Third, Seventh, Ninth and Tenth circuits have, in recent years, subjected errata sheet changes under Rule 30(e) to levels of scrutiny equivalent to that under the "sham affidavit" doctrine. *See EBC, Inc. v. Clark Building Systems, Inc.*, No. 09-1182, 2010 WL 3239475, *10-11 (3d Cir. Aug. 18, 2010) ("We see no principled reason to distinguish between affidavits and errata sheets in this context, and we conclude that the proper analysis for each is the same."); *Hambleton Brothers*

*Lumber Co. v. Balkin Enterprises, Inc.*, 397 F.3d 1217 (9th Cir. 2005) ("We think this type of 'sham' correction is akin to a 'sham' affidavit."); *Burns v. Board of County Commissioners of Jackson County*, 330 F.3d 1275, 1282 (10th Cir. 2003) ("We see no reason to treat Rule 30(e) corrections differently than affidavits . . . ."); *Thorn v. Sundstrand Aerospace*, 207 F.3d 383 (7th Cir. 2000). These courts hold, as Chief Judge Posner put it in the *Thorn* case, "by analogy to the cases which hold that a subsequent affidavit may not be used to contradict the witness's deposition . . . that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as a correction of an error in transcription, such as dropping a 'not.'" *Thorn*, 207 F.3d at 388 (internal citations omitted); *see also* 8A Wright, Miller & Marcus, *Federal Practice and Procedure* § 2118 n.4; *id.* §2118 n.5. Nonetheless, even the most searching analysis employed by any court permits "material changes" to be made in Rule 30(e) errata sheets if the deposition itself discloses "obvious confusion" on behalf of the deponent and the errata sheet changes serve to clarify that confusion. *Burns*, 330 F.3d 1282 (quoting *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5) (internal quotation marks omitted).

As both parties concede, the Eleventh Circuit has not squarely addressed the extent of alteration permissible under Rule 30(e).[78] The Court has, however,

---

[78] *See* doc. no. 30, at 2; doc. no. 32, at 2.

summarily affirmed a case that, citing the analogy other courts have made to sham affidavit analysis, held that alterations that squarely contradict evidence in the record or, perhaps, materially change deposition testimony that evinces no obvious confusion should not be permitted. *Reynolds v. International Business Machines Corp.*, 125 Fed. Appx. 981 (11th Cir.), *aff'g* 320 F. Supp. 2d 1290, 1300-01 (M.D. Fla. 2004). Further, another judge within the Northern District of Alabama has granted a motion to strike proposed changes in a Rule 30(e) errata sheet that, in addition to omitting the procedurally-required reasons for the changes, also exceeded the permissible scope of substantive alterations under the rule. *McCarver v. PPG Industries, Inc.*, 243 F.R.D. 668, 669 (N.D. Ala. 2007) (Clemon, J.).

Gates concedes that *McCarver* is merely persuasive,[79] but, on the other hand, plaintiff provides no sound reason this court should not be persuaded. Given recent developments in caselaw around the country, this court is far from convinced that the no-limitations view of the permissible scope of substantive alterations under Rule 30(e) may continue properly to be characterized as that of the majority. Further, the Eleventh Circuit's apparent approval of the view that errata sheets should be excluded when functionally equivalent to sham affidavits, though not itself controlling,[80]

---

[79] Doc. no. 32, at 2.

[80] *See* Eleventh Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

persuades this court that changes to a deposition made under Rule 30(e) should, as would be the case with an affidavit, be stricken if contradictory to clear deposition testimony. Nevertheless, even under such an analysis, plaintiff's errata sheet is not due to be stricken.

Careful application of the Eleventh Circuit's sham affidavit analysis to the changes made by plaintiff's errata sheet reveals that, while those changes may not ultimately be credible, they are not inadmissible as a matter of law. In *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir. 1986), the Eleventh Circuit explained the proper analysis thusly:

> A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence. An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility.

> To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. An *affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue*

> *of material fact ... [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.*" *Van T. Junkins* [*& Associates v. United States Industries, Inc.*, 736 F.2d 656,] 657 [(11th Cir. 1984)].

*Tippens*, 805 F.2d at 953-954 (emphasis supplied) (some internal citations and quotations marks omitted).  The Eleventh Circuit further clarified the appropriate standard two years later in the case of *Rollins v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987), saying that

> our cases require a court to find *some inherent inconsistency* between an affidavit and a deposition before disregarding the affidavit.  If no inherent inconsistency exists, the general rule allowing an affidavit to create a genuine issue "even it if conflicts with earlier testimony in the party's deposition,"  *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980), governs.  In these instances, any conflict or discrepancy between the two documents can be brought out at trial and considered by the trier of fact.

*Rollins*, 833 F.2d at 1530 (emphasis supplied).  Only rarely should the doctrine result in the exclusion of evidence.  *See id.* (stating that the rule should be applied "sparingly because of the harsh effect [it] may have on a party's case").

As previously noted, Gates argues that plaintiff's handwritten list impermissibly alters her deposition testimony by "increas[ing] the incidents of verbal harassment she alleges from approximately five or six to twenty-eight . . . ."[81]  Gates further contends that plaintiff's alleged clarification of her testimony about the

---

[81] Doc. no. 32, at 14-15.

chronology of the final alleged incidents via the errata sheet is a blatant attempt to create "two separate incidents" from what her "clearly given responses to clearly answered questions" indicate was only a single incident.[82]   Yet, a thorough examination of plaintiff's deposition suggests it is, in nearly all parts, far from clear and, as a result, cannot be inherently inconsistent as a matter of law.

With respect to what defendant calls the "most egregious[]" alteration — plaintiff's handwritten exhibit of "Things Collins has Said" — the deposition transcript may easily be read *not* to contain any inherent inconsistency with that list of statements.[83]   Indeed, at least six times during her deposition, plaintiff testified or indicated that "there was lots of times that was verbal."[84]   Even though plaintiff only recounted five (or six) incidents as Gates insists, her deposition testimony can readily be read to indicate that she recalled significantly more, but was either unable to fit them into the chronology-oriented format presented to her by defense counsel's questions, or was unwilling to utter the vulgar language aloud.[85]   The following

---

[82] *Id.* at 6-14.

[83] *See* Mullins Deposition Amendment, at 4-5; doc. no. 23, at 3.

[84] Mullins Deposition, at 72; *see also, e.g.*, *id.* at 56 (conflating what self-evidently appear to be multiple instances of alleged verbal harassment); *id.* at 58 (after describing several different comments, stating "[t]here was all different episodes"); *id.* at 65 ("He said stuff all the time . . . ."); *id.* at 81 ("The first of January was fine. Towards the end — towards the middle, he got to where he was verbally abusing me again as in — I don't even want to say all the things that he said"); *id.* at 82-83 ("[T]he middle of January is when . . . he started to get where he was very verbal.").

[85] *See, e.g.*, *id.* at 72-74, 76.

exchange is illustrative:

Q:  What was the first thing that happened in January '08 between you and Collins that you claim sexual harassment for?

A:  The last little episodes?

Q:  January —

A:  The first of January was fine.  Towards the end — towards the middle, he got where he was verbally abusing me again as in — I don't even want to say all the things that he said.

Ms. Smith [counsel for plaintiff]:  Here.  Write them down.

Mr. Wilmer [counsel for Gates]:  No, we're not doing that.

Ms. Smith:  Well, she needs to tell you —

Mr. Wilmer:  Well, she's going to tell me.

Ms. Smith:  She doesn't necessarily have to say the nastiness, John.

Mr. Wilmer:  Let me get on with my examination.  I'm going to be gentle.

. . .

A:  I'll say it. It's not appropriate.

Q:  Anyway, what was the first thing that happened between you and Collins in January that you can remember?

A:  Starting in January was the last — the last before is when he grabbed my butt, and I made the report – the last report before the last I just told you about; that was the first one – that was the middle in January when I made the last report — the last statement before the last, where he

grabbed my butt and I went and reported it to Peggy and —

Q:  Okay.

A:  Do you see — [86]

Neither the questions, nor the answers, nor, as a result, the inconsistencies, are "clear" or "inherent."  Consequently, the "harsh" remedy of striking the substantive changes plaintiff was permitted under Rule 30(e) to make is not warranted in this case. Moreover, permitting plaintiff to append the list of explicit statements is consistent with determinations other courts in this circuit have made when wrestling with the scope of substantive alterations Rule 30(e) permits.  *See, e.g.*, *Dering v. Service Experts*, 69 Fed. R. Serv. 3d 939 (N.D. Ga. 2007) (finding that a subsequently appended list of specifics that elaborated upon generalities in a deposition was "not contradictory" and, thus, not due to be stricken).

The same result obtains to Gates' objections with respect to the final alleged incidents of harassment.  In her deposition, plaintiff repeatedly stated that she "can't remember" and changes her answers with respect to whether an incident in question occurred on January 23 or 24.[87]  Even the questioning by Gates' counsel explicitly

---

[86] *Id.* at 81-82.

[87] *See* 86-88; *id.* at 109-110 ("I can't give you the exact dates. I don't know. I just know that I wrote this down, and I didn't lie."); *id.* at 110 ("On my dates, I can't get the dates right."); *id.* at 111 "I don't know."); *id.* at 112 ("I can say I'm not really sure about the dates. I might have the dates confuesd just a little bit, but I am sure they happened."); *see also id.* at 133-35.

indicates as much.[88]  Moreover, plaintiff's confusion and state of upset evident in the relevant portions of the deposition transcript itself result in such internal uncertainty about the dates upon which occurred the multiple incidents toward the end of her employment that she attempts to describe, that it is impossible to say that the existence of a second incident[89] is inherently inconsistent with plaintiff's deposition testimony.

Gates makes much of the fact that plaintiff is attempting to alter her "sworn testimony,"[90] yet, in addition to being plausibly consistent with her deposition testimony, plaintiff's errata sheet is also signed and sworn.[91]  Further, to the extent Gates is prejudiced by plaintiff's errata sheet, that prejudice is largely a result of its tactical decision to delay its motion to strike.  Rather than petitioning this court to reopen plaintiff's deposition to permit it to thoroughly examine the material alterations it claims the errata sheet makes, as some courts have suggested is the preferable remedy under Rule 30(e), Gates stood pat while the time for discovery ran. *E.g.*, *Reilly v. TXU Corp.*, 230 F.R.D. 486, 490-91 (N.D. Tex. 2005) (agreeing with and reciting multiple cases holding that reopening a deposition is the proper remedy

---

[88] On page 112 of the Mullins Deposition, defense counsel asks, twice, "Would it be fair to say that you don't know when these things happened exactly?"

[89] *See* Mullins Deposition, at 70-72, 106-112, 115-116. 130-134.

[90] *See* doc. no. 23, at 1, 3, 9, 11, 14, 15, 16.

[91] Mullins Deposition Amendment, at 1.

where a 30(e) errata sheet significantly alters testimony).  The errata sheet was sworn and signed on October 7, 2009, nearly two months before discovery was to be completed, and nearly three months before defendant moved to strike, not coincidentally in conjunction with their motion for summary judgment.[92]

In summary, plaintiff's errata sheet is readily susceptible to a reading plausibly consistent with the admittedly confused nature of her deposition testimony.  This is not to say that the reading plaintiff offers is the more credible, or to indicate that impeachment with the discrepancies would not be powerful, but only to recognize that the inconsistency is not so blatant as to constitute a "transparent sham" and, thereby, warrant granting Gates' motion to strike.  *Tippens*, 805 F.2d at 953 ("A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.").  Accordingly, Gates motion to strike is due to be denied.

**B.    Gates' Motion for Summary Judgment as to All of Plaintiff's Claims**

**1.    Title VII claims**

**a.    Hostile work environment**

Plaintiff claims that Omodue's conduct and comments created a sexually hostile work environment at Gates.  To succeed on this claim, plaintiff must show:

---

[92] Doc. no. 23 (motion to strike, dated January 1, 2010); *id.*, Ex. 2 (errata sheet dated October 7, 2009); doc. no. 13 (scheduling order).

> (1) that . . . she belongs to a protected group; (2) that [she] has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment [was] based on [her] sex . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (*en banc*).

"Workplace conduct is not measured in isolation."  *Clark County School District v. Breeden*, 532 U.S. 268, 270 (2001) (*per curiam*).  "Rather, the evidence of harassment is considered both cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 805 (11th Cir. 2010) (*en banc*) (quoting *Mendoza*, 195 F.3d at 1242).

The first three elements of plaintiff's *prima facie* case are not in dispute.  As a female, plaintiff belongs to a protected group.  *See Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir. 1982) ("As in other cases of sexual discrimination this [element] requires a simple stipulation that the employee is a man or a woman."). Further, there is evidence plaintiff was subjected to sex-based comments and behavior that she found unwelcome.[93]  Defendant argues, however, that the fourth and fifth elements have not been satisfied.

### i.      Severity or pervasiveness

---

[93] *See* doc. no. 25, at 13.

The requirement that the alleged harassment be sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. *Mendoza*, 195 F.3d at 1246. To satisfy this element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such. *See, e.g.*, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). When evaluating the objective severity of offensive conduct, courts examine the totality of the circumstances, including: the frequency of the conduct; the severity of the conduct; whether the conduct was threatening or humiliating, or a mere offensive utterance; and whether the conduct unreasonably interfered with plaintiff's work performance. *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc*., 234 F.3d 501, 509 (11th Cir. 2000) (quoting *Mendoza*, 195 F.3d at 1246); *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). It is not necessary to prove each of the factors individually. But, Title VII is not a "general civility code," and the factors, taken together, must reveal conduct that is so extreme that it caused a material change in the terms and conditions of plaintiff's employment, and created a working environment that a reasonable person would find discriminatorily abusive. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Gates contends that no reasonable person would have found plaintiff's working

27

environment discriminatorily abusive.  Yet, Gates allows that plaintiff has provided evidence of at least "four specific incidents of physical touching over a thirteenth month period . . . ."[94]  In at least three or these instances, Omodue either grabbed or "popped" plaintiff on her posterior.  In another, clearly testified to but ignored by defendant, plaintiff testified that Omodue "cornered" her and told her that he wanted to "take [her] home and bang [her], get [her] knocked up so [she] could have his baby . . . ."[95]  In the final instance, plaintiff testified that Omodue shoved her up a against wall and began "putting his hands all over [her] body."[96]  Each of these incidents of conduct could be considered threatening and offensive and at least the final incident is, viewed objectively, severe.

Further, plaintiff testified in her deposition that she gave up more desirable positions at Gates "so I wouldn't have nobody to come in and out of my area."[97]  She testified that she was shuffled throughout the company on a regular basis in order to keep her "separated" from Omodue.[98]  In other words, the conduct interfered with plaintiff's work performance and advancement, forcing her to divert the track she may otherwise have taken at Gates in order to avoid further harassment.  *Cf. Harris*, 510

---

[94] Gates lists three such occurrences. Doc. no. 25, at 17.

[95] Mullins Deposition, at 83.

[96] *Id.* at 69, 93-94.

[97] *See id.* at 64-65, 78-80.

[98] *Id.* at 69, 96-97, 99, 100-101.

U.S. at 22 (a hostile work environment may "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers").

In her deposition, plaintiff testified to at least six separate sexually-charged comments Omodue made to her,[99] three regarding sensitive parts of her anatomy[100] and three putative sexual propositions, including the following exchange: "He [said] he wanted to take me home and bang me, get me knocked up so I could have his baby . . . . That he always wanted a mixed [race] baby."[101]  In plaintiff's errata sheet, which this court considers as evidence for purposes of summary judgment, plaintiff expounds upon her repeated statements that Omodue "said stuff all the time"[102] by cataloguing a total of twenty-eight comments she claims Omodue directed at her over the course of the thirteen-month period at issue.[103]  Gates correctly notes that many of these are "much more lurid" than those to which plaintiff explicitly testified in her deposition:  including three instances in which "[h]e said that he wanted to f___ me,"

---

[99] Gates lists five comments in its statement of undisputed facts. Doc. no. 25, at 1-12, ¶¶ 11, 13, 16, 20, 23.  Viewed in the light most favorable to plaintiff, the comments described on page 83 are more properly considered separate, though Gates' brief condenses them into a single occurrence.

[100] *See* Mullins Deposition, at 56 (plaintiff recounting statement she claims Omodue made to her that she had a "nice ass and a pretty set of breasts"); *id.* at 77-78 ("Yeah, I love seeing your body when it's sweaty like that"); *id.* at 83 ("[H]e started to get where he was very verbal. . . . That he loved the way that my legs was.").

[101] *Id.* at 85; *see also, e.g.*, *id.* at 56, 58, 65-66, 72, 76.

[102] *E.g.*, Mullins Deposition at 65.

[103] Mullins Deposition Amendment, at 4-5.

two in which "he ask me if he could fu_ me," two in which "[h]e said that he loved
to see me in his bed fuc___ him," and three in which "[h]e said that he would like to
see my pink p_____."[104]   However, as noted above, while this language is much more
shocking, it is entirely consistent with plaintiff's repeated assertions that Omodue was
regularly verbally abusive, and that she did not "want to say [aloud] all the things that
he said."[105]   Even presuming plaintiff's handwritten sheet catalogues the totality of
Omodue's verbal harassment (a dubious proposition when it does not appear to
contain all of the statements this court has found in her deposition), twenty-eight
separate instances of verbal harassment[106] over the course of approximately fifty-five
weeks equates, roughly, to more than one incident every two weeks.   In conjunction
with the physical incidents discussed above, that frequency increases to an average
of one incident every twelve days for more than a year.   This court cannot say that
this is "infrequent" as a matter of law.   *Compare Johnson,* 234 F.3d at 509 (holding
that "roughly fifteen separate instances of harassment over the course of four months"
was sufficiently frequent), *with Mendoza,* 195 F.3d at 1248-49 (holding that four
incidents over an eleven-month period were insufficiently frequent).

---

[104] *Id.*

[105] Mullins Deposition at 81; *see also* note 83 and text accompanying note note 85, *supra*.

[106] Twenty-eight is the calculation Gates provides in its reply brief in support of its motion
to strike plaintiff's errata sheet.  Doc. no. 32, at 10.  While even a careful reading of the record
makes exact calculation of the number of verbal instances plaintiff claims difficult, this court has no
reason to quibble with the number Gates provides.

The Eleventh Circuit has cautioned that "sexual harassment claims . . . present fact-intensive issues," and that summary judgment is available solely to "police the baseline for hostile environment claims." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (*en banc*) (quoting *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 n.8 (5th Cir. 1999). At bottom, Gates' arguments address the issues of credibility and the weight of evidence. At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Considering the evidence — as the court must — in the light most favorable to the non-moving party, the court readily concludes plaintiff has adduced sufficient evidence of severity or pervasiveness to rise above the *prima facie* baseline.

As plaintiff has satisfied the first four elements of a hostile work environment claim, her claim will survive summary judgment, unless defendant can show that there is no basis for holding the company liable.

### ii.    Employer liability

Gates contends that, even if plaintiff has established the first four elements of her *prima facie* case, there is no basis for holding the company liable for the actions of Omodue.[107]  Where, as here, the claimed harassing conduct for which the plaintiff

---

[107] Doc. no. 25, at 20.

seeks to impose liability upon the employer was that of a co-worker, the employer's liability is judged by a negligence standard — that is, a plaintiff must prove that the employer either "knew (actual notice) or should have known (constructive notice) of the harassment and failed to take [prompt and appropriate] remedial action." *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000); *see, e.g.*, *Faragher*, 524 U.S. at 799 (collecting cases); *Burlington Industries, Inc. v. Ellerth*, 524 U.S.742, 759 (1998) ("Negligence sets a minimum standard for employer liability under Title VII."); *see also*, *e.g.*, *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003) ("When . . . the alleged harassment is committed by co-workers or customers, a Title VII plaintiff must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action."); *Succar v. Dade County School Board*, 229 F.3d 1343, 1344-45 (11th Cir. 2000) (*per curiam*) (same); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir. 1989) (same); 29 C.F.R. § 1604.11(d) (1997) (an employer is liable for co-worker harassment if it "knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action").

Gates was undoubtedly aware of the sexual harassment and, indeed, does not seriously contest its knowledge.[108]  Indeed, Gates identifies five complaints plaintiff

---

[108] Gates does not contest knowledge at all in its brief in support of summary judgment, (doc. no. 25, at 20-21) and, indeed, appears therein to admit that it was aware by claiming that it "took

made, mostly in writing, in its statement of unopposed facts.[109]  Gates also received

a complaint by another female employee about an intimidating physical encounter

with Omodue at some point within the months preceding plaintiff's first complaint.[110]

Moreover, Gates makes no serious attempt to argue the company undertook

adequate remedial measures in either its brief in support of summary judgment or

reply brief, arguing only that the measures undertaken in the few days leading up to

plaintiff's resignation were adequate and ignoring, entirely, the twelve months

preceding that point.[111]  During those months, there is evidence that plaintiff was

transferred to different units multiple times.[112]  Yet, defendant does not even argue,

---

prompt measures to address Mullins' complaints during her employment."  The only notice Gates presents any argument about, once it focuses upon the correct legal standard in its reply brief, is notice about defendant Omodue's harassment of *another employee*, Peggy Newland, more than a year prior to the harassment plaintiff claims. Doc. no. 36, at 6-7.

[109] *Id.* ¶¶ 12, 14, 19, 22, 28.  Though couched, in each instance, as Mullins "claims," Gates presents Mullins' complaints in its statement of undisputed facts, and presents no contrary evidence to speak of.  Most importantly, for purposes of summary judgment, these facts are viewed in the light most favorable to Mullins.

[110] *See* Newland Deposition, at 13-20.  ("I was walking towards the back and going towards the front of the drycleaning machines, and he just came up to me and grabbed me and was pushing me back towards behind the machines and he was grabbing me by my breast and saying, 'Let me see 'em, let me see 'em.'").  Ms. Newland, thereafter, made a complaint about Omodue, acknowledged by Gates.  *Id.*  Ms. Newland testified the event occurred three years prior to her deposition on November 12, 2009, *Id.* at 5, 13, or shortly before plaintiff's first complaint in January of 2007, Mullins Deposition, at 56.

[111] *See* doc. no. 25, at 21; doc. no. 36, at 7.

[112] Mullins Deposition, at 69 ("They kept moving me, but it didn't do no good."), 96-97 ("Jim had done moved me four or five times, because that was his idea, to move me or to move him."), 99 ("The only thing Mr. Bibb told me was that he was going to try to keep us separated. And I said, 'Is that all you're going to do?' He said that's all he could do was try to keep us separated."), 100-101.

as it could not seriously do, that transferring the *complaining party* multiple times, sometimes into less desirable positions, is an appropriate remedial action.  Separation may be an adequate response when coupled with other measures, *see Paraohao v. Bankers Club, Inc.*, 225 F. Supp. 2d 1353, 1360 (S.D. Fla. 2002) (temporary reassignment coupled with immediate investigation), but, especially in light of the number of complaints plaintiff lodged, Gates' actions were not adequate remedial measures as a matter of law.

Plaintiff has, therefore, provided evidence above the threshold required to defeat summary judgment on each of the five elements of a hostile work environment claim under Title VII.  Accordingly, Gates' motion for summary judgment is due to be denied, with respect to count I of plaintiff's second amended complaint.

### b. Constructive Discharge

Plaintiff also claims that she was constructively discharged from her employment with Gates as a consequence of the continued hostile work environment to which she claims to have been subjected.[113]  "[A] hostile work environment is a necessary predicate to a hostile-environment constructive discharge [claim]."

---

[113]Plaintiff did not assert a separately enumerated claim for constructive discharge in her complaint.  Nonetheless, in the fact section of her Second Amended Complaint, she states, "Plaintiff was constructively discharged because her work conditions were so intolerable that she was compelled to resign."  Doc. no. 5, at ¶ 22.  Thus, construing the allegations of plaintiff's complaint in the light most favorable to her, the court will consider plaintiff's claim for constructive discharge.

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 149 (2004).  As discussed above, "[f]or an atmosphere of sexual harassment or hostility to be actionable . . . the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* at 146-47 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  "A hostile-environment constructive discharge claim entails something more:  A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."  *Id.* at 147 (citing *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.")).

When assessing constructive discharge claims, courts within the Eleventh Circuit "do not consider a plaintiff's subjective feelings about his employer's actions."  Rather, courts in this circuit determine whether "a reasonable person in [the plaintiff's] position would be compelled to resign."  *Doe v. Dekalb County School District*, 145 F.3d 1441, 1450 (11th Cir. 1998) (quoting *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989)) (other citations omitted).  Additionally, a plaintiff "must do more than merely show that she was subjected to

actionable harassment," because "'[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment.'"   *Walton v. Johnson & Johnson Services, Inc.,* 347 F.3d 1272, 1282 (11th Cir. 2003) (citing *Hipp v. Liberty National Life Insurance Co.,* 252 F.3d 1208, 1231 (11th Cir. 2001)).

Here, as noted above, plaintiff has satisfied the predicate requirement of presenting sufficient evidence to support a *prima facie* case of a hostile work environment.  Gates, however, contends it is entitled to judgment as a matter of law on plaintiff's claims of constructive discharge on two bases:  (1) the harassment plaintiff contends that she endured was not so severe as to make her work environment objectively intolerable, and (2) plaintiff did not give Gates sufficient time to remedy the situation.  The court finds that, notwithstanding the high burden plaintiff will have to surmount to prove her constructive discharge claim, the evidence she has presented, when viewed in a light most favorable to her, is not insufficient to support such a claim as a matter of law.

Gates' first contention is that plaintiff was not subjected to harassment so egregious that a reasonable person would have felt compelled to resign.[114]  Plaintiff asserts that she was subjected "to an ongoing pattern of reprehensible behavior"[115]

---

[114] Doc. no. 25, at 22-23.

[115] Doc. no. 33, at 19.

and, after several futile complaints to Gates, left because, as she testified, she "wanted to be able to go to a job and work and feel safe, feel secure, not have to worry about if I'm going to turn the corner and bump into him . . . ."[116]   As described above, plaintiff has presented evidence that she endured regular verbal and physical harassment.  Moreover, notwithstanding Gates' assertion that plaintiff "made her first complaint to Gates management about Omodue in 2008," it acknowledges that she "complained to [Jim] Shockley," the supervisor to whom employees were instructed to take complaints,[117] "in January 2007 . . . ."  Gates further acknowledges that plaintiff that has presented evidence of two more complaints to supervisory authority between January 2007 and 2008,[118] and another one thereafter before she resigned.[119] Notwithstanding these *five written complaints* interspersed over the course of thirteen months, plaintiff has presented evidence of more than thirty incidents of physical and verbal harassment.

Employees have an "obligation to be reasonable[,] not to assume the worst, and not to jump to conclusions too fast," *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987), before "choosing to resign, and then labeling that resignation

---

[116] Mullins Deposition, at 98.

[117] *See* doc. no. 25, at 3, ¶ 8.

[118] Doc. no. 25, at 23, n.12; *see also* Mullins Deposition, at 61-64, 70.

[119] *See* Mullins Deposition, at 98-101.

as a constructive discharge," *Matthews v. City of Gulfport*, 72 F. Supp. 2d 1328, 1338-1339 (M.D. Fla. 1999) (citing *Garner*, 807 F.2d at 1539). "[C]ritical . . . to [a] court's analysis of an employee's constructive discharge claim is whether the employer took reasonable steps to respond to the employee's complaints about harassment." *See Reed v. Gulf Coast Community College*, No. 5:09cv237/RS/EMT, 2010 WL 2926556, at *10 (N.D. Fla. June 29, 2010) (citing *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001)). Further, a plaintiff claiming constructive discharge must show "a greater severity or pervasiveness of harassment," such that resignation is the only reasonable response. *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009). That is, the conduct that created the hostile work environment must have been "ratcheted up to the breaking point . . . ." *Suders*, 542 U.S. at 148.

Plaintiff testified that in January, 2008, Omodue "started to get where he was very verbal again" and "corner[ed] her one day and told [her] that he wanted to take [her] to his house" for sexual purposes.[120]   On January 18, she filed a written complaint with Gates' management after Omodue "grabbed [her] on the bottom."[121] There is evidence Omodue grabbed her buttocks again, three days later.[122]   Plaintiff has presented evidence that, on January 23 and 24, there were two incidents of sexual

---

[120] Mullins Deposition, at 82-83.

[121] *Id.* at 125.

[122] Mullins Deposition, Defendant's Exhibit 13.

harassment.[123]   There is evidence that one of these incidents[124] involved Omodue pinning plaintiff against a wall, and grabbing her on her breasts and between her legs — "virtually the same thing" that had happened to Peggy Newland approximately one year and a half prior.[125]   She wrote another complaint about this incident and filed a police report.[126]

This evidence would allow, though by no means compel, a jury to infer that plaintiff feared the harassment was escalating.  That the January 23 (or 24) incident occurred approximately a week after plaintiff's January 18 complaint would permit the further inference that the conduct was escalating in spite of her complaints to Gates.  Given the evidence plaintiff has presented regarding the number of complaints she lodged with Gates regarding Omodue's conduct between January 2007 and January 2008, and regarding both the severity and frequency of the conduct that occurred in spite of these complaints, this court cannot say that her belief further complaints would be futile was unreasonable as a matter of law.[127]  Further, especially in light of the physical incidents and graphic sexual propositions and in conjunction

---

[123] Mullins Deposition Amendment, 2-3.

[124] It is unclear from the record whether or not plaintiff's testimony is that this incident occurred on January 23 or January 24.  *Cf.* Mullins Deposition Amendment, at 2-3; Mullins Deposition at 89-95, 106, 117, 131.

[125] *See* Brewer Deposition, at 18-23; Mullins Deposition, at 89-94.

[126] Mullins Deposition, at 93-95; Brewer Deposition, at 17-23.

[127] *E.g.*, Mullins Deposition, at 106-09, 114-16.

with her fear complaints were futile, Gates has not convinced this court that no reasonable jury could conclude that her working conditions were intolerable. Indeed, the facts here are far more in line with those cases finding constructive discharge a question for the jury than those holding the defendant entitled to summary judgment. *Compare Morgan v. Ford*, 6 F.3d 750, 756 (11th Cir. 1993) (holding that an issue of fact existed as to whether plaintiff was constructively discharged where her harasser, as her supervisor, repeatedly asked her out despite plaintiff's rebuffs; the harasser, as supervisor, "hovered" around plaintiff; the harasser, even after being reassigned, returned to give plaintiff "undesired attentions and reports of masculine virility"; the harasser had co-workers send notes that he missed plaintiff after she complained; and there was the prospect that the harasser would again become her supervisor), *and E.E.O.C. v. SDI Athens East, LLC*, 690 F. Supp. 2d 1370, 1374 (M.D. Ga. 2010) (summary judgment not available on constructive discharge claim where employee provided evidence of several comments, one slap on the buttocks, one occasion where the alleged harasser put his arm around her neck, one instance where he picked her up, and several "hugs"), *with Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316-18 (11th Cir. 1989) (affirming finding that female employees *were* subjected to a hostile work environment, based upon sexually-oriented jokes, requests for sexual favors, suggestive comments about attire, in spite of no physical contact, but

affirming that this conduct *was not* sufficient to support a constructive discharge claim).

None of the cases cited by defendant convince this court to the contrary. The Eleventh Circuit affirmed summary judgment for the defendant on a constructive discharge claim in *Vander Meulen v. Brinker International*, 153 Fed. Appx. 649 (11th Cir. 2005), because plaintiff "specifically testified that no sexual harassment occurred between her first conversation with [the designated supervisor] about [the] harassment and the day that she quit . . . ." *Id.* at 657. The same occurred in *Smith v. M.G.A., Inc.*, No. 1:04-CV-1216-WKW, 2006 WL 827107 (M.D. Ala. March 29, 2006), and, moreover, the court found *there had been no hostile working environment at all* in that case. *Id.* at *5-6. The panel in *Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272 (11th Cir. 2003), expressly did "not decide whether a claim of constructive discharge would fail given the facts in the record," finding that the plaintiff had abandoned her constructive discharge claim. *Id.* at 1282. *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987), affirmed a *judgment on the facts*, not a *summary judgment* that the plaintiff was not constructively discharged *as a matter of law*, and, even in so doing, noted that it was facing a "hard[] question[.]" *Id.* at 1539.

Gates' alternative argument is that Mullins did not give Gates "sufficient time

to remedy the situation."   Again, however, Gates focuses *exclusively* upon the complaint made on January 24, 2008, ignoring the four previous complaints it lists itself on the *previous page of its brief*.[128]   It is well-established that summary judgment on a claim of constructive discharge may be appropriate where an employee gives her employer little or no time to correct alleged sexual harassment, but there is no authority whatsoever for the proposition that an employee may not, as a matter of law, assert constructive discharge where her first complaint preceded her resignation by more than one year.   *See, e.g.*, *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 754 (11th Cir. 1997) (affirming summary judgment on a claim of constructive discharge where "[n]one of the plaintiffs returned to work after complaining").

In sum, plaintiff has submitted sufficient evidence that her resignation was a result of the continuation of a hostile work environment after she had complained about it numerous times, that the harassment was objectively intolerable, and that she was reasonable in resigning.   This court is unable to hold Gates is entitled to summary judgment on her constructive discharge claim.

2.   **State Law Claims**

Plaintiff also asserts supplemental state law claims for assault and battery,

---

[128] *Compare* doc. no. 25, at 23 n.12, *with id.* at 24.

invasion of privacy, outrage, and negligent and/or wanton, hiring, supervision, training, and/or retention, claiming Gates is vicariously liable for the tortious conduct of defendant Omodue, or directly liable for its own actions. While "[i]t is well settled that Alabama does not recognize an independent cause of action for sexual harassment," claims premised upon the same conduct may be "maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage." *Machen v. Childersburg Bancorporation, Inc.*, 761 So. 2d 981, 983 n.1 (Ala. 1999) (citations omitted).

### a.    Intentional tort claims

Gates contends that summary judgment must be granted as to plaintiff's state law claims against it for assault and battery, outrage, and invasion of privacy, because it did not authorize, ratify, and/or condone Omodue's tortious behavior. Gates also contends that, even if there is a theoretical basis for its liability for Omodue's actions, it is nonetheless entitled to summary judgment because Omodue's conduct did not rise to the level of the torts plaintiff asserts.[129]

### i.    Ratification

"For [an employer] to become liable for the intentional torts of its agent, the plaintiff[] must offer evidence that [1] the agent's wrongful acts were in the line and scope of his employment; or [2] that the acts were in furtherance of the business of [the employer] or [3] that [the

---

[129] *See* doc. no. 25, at 24-29.

employer] participated in, authorized, or ratified the wrongful acts."

*Potts v. BE & K Construction Co.,* 604 So. 2d 398, 400 (Ala. 1992) (bracketed alterations in original) (quoting *Joyner v. AAA Cooper Transportation,* 477 So. 2d 364, 365 (Ala. 1985)).  Plaintiff does not assert that Omodue's acts were in the line and scope of his employment, or in the furtherance of Gates' business.[130]  There also is no allegation that Gates participated in Omodue's conduct.[131]  Thus, the relevant question is whether Gates ratified Omodue's wrongful acts.

To prove that Gates ratified Omodue's conduct, plaintiff must show that Gates "either expressly adopted [his] behavior or that it implicitly approved of it."  *Potts,* 604 So. 2d at 400.  Plaintiff may do so by demonstrating

> that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take "adequate" steps to remedy the situation.

*Id.*  The foregoing discussion claims makes clear that defendant is not entitled to summary judgment with respect to the first two elements.  Thus, the success of plaintiff's ratification theory turns upon whether Gates took adequate steps to remedy the situation.

---

[130] *See* doc. no. 23, at 26-28.

[131] *Id.*

44

In the context of an employer's ratification of an employee's harassing behavior, "adequate" steps are those which are "reasonably calculated to halt the harassment."  *Potts,* 604 So. 2d at 401.  The Alabama Supreme Court, however, further clarified this standard for the purposes of summary judgment in the following manner:

> [I]f the undisputed evidence shows that the employer, as soon as it was practical to do so after learning of the conduct, took steps to stop the tortious conduct and *the tortious conduct stopped*, the steps taken by the employer were adequate, as a matter of law.
>
> Conversely, evidence that an employer, after learning of the tortious conduct, failed to stop the tortious conduct of the offending employee presents a question of fact, unique under the circumstances of each case, as to whether the steps taken to stop the conduct were adequate.

*Id.* (emphasis in original).  While the *Potts* court expressly limited its holding "to the facts of [that] case," *id.* at 402, subsequent decisions make clear that this standard, in cases alleging sexual harassment, always precludes summary judgment on the question of ratification under Alabama law when the employer's response to a complaint failed to halt the conduct.  *See, e.g., Machen v. Childersberg Bancorporation, Inc.*, 761 So. 2d 981, 985-86 & n.5 (Ala. 1999) (characterizing *Potts* as setting forth a "rule" that "recurrence is sufficient to create a jury question as to the adequacy of the employer's steps to remedy"); *see also id.* at 989 (Johnstone, J., dissenting) (contending that the holding of *Potts* "that substantial evidence of such

a recurrence creates . . . a jury question for the purpose of determining whether the employer ratified the allegedly offending employee's conduct" should be abandoned).

Gates does not, as it cannot, given the record before the court, argue that there is no evidence Omodue's alleged conduct did not recur after plaintiff notified the proper supervisor at Gates.[132]   Rather, Gates entirely ignores the *Potts* line of authority and asserts in a conclusory manner that it "undertook adequate remedial steps to remedy known allegations of harassment"[133] and, consequently, cannot be held liable.  Yet, under Alabama law, the adequacy of an employer's remedial actions is invariably a jury question once a plaintiff has presented evidence of a recurrence. *See, e.g.*, *Potts*, 604 So. 2d at 401-02 ("Whether the disciplinary action taken by BE & K was adequate to stop Sanders from harassing Potts or other female employees of BE & K is a question of fact.  The effect of the length of time between when BE & K got knowledge of the conduct and when it took disciplinary action is for the jury to consider, and so is the severity of the disciplinary action as compared to the seriousness of the conduct.").   Accordingly, plaintiff has presented sufficient evidence to create a genuine issue of material fact about whether Gates may be liable for Omodue's actions on a theory of ratification.

---

[132] *Cf.* doc. no. 25 ("Each time Mullins complained to Gates' manager Jim Shockley, he promptly reassigned her within the building so that she and Omodue would not be in contact with one another.").

[133] Doc. no. 36, at 8; *see also*, doc. no. 25, at 24-25, 28, 29.

###### ii.     Assault and battery

Count II of plaintiff's Second Amended Complaint asserts that Omodue's actions constituted assault and battery, and that Gates should be liable for that tort. Gates contends that, even if it is determined to have ratified Omodue's conduct, it is entitled to summary judgment on these claims because Omodue's conduct did "not rise to the level of assault and battery."[134]

Under Alabama law, an assault is defined as "'an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'" *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995) (quoting *Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990)) (internal quotation marks omitted). "A successful assault becomes a battery, which consists of the touching of another in a hostile manner." *Id.* (citing *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986)). Specifically, "[t]o succeed on a claim alleging battery, a plaintiff must establish: (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Ex parte Atmore Community Hospital*, 719 So. 2d 1190, 1193

---

[134] Doc. no. 25, at 26.

(Ala. 1998).  "At common law, 'any touching by one person of the person of another in rudeness or in anger is an assault and battery.'"  *Hinson v. Holt*,  776 So. 2d 804, 810 (Ala. Civ. App. 1998) (quoting *Seigel v. Long*, 53 So. 753, 754 (1910)).

In *Ex parte Atmore Community Hospital*, the plaintiff submitted evidence that her supervisor intentionally "touched [her] waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg" in a manner that was sexual in nature.  719 So. 2d at 1194.  The Alabama Supreme Court held that conduct sufficient to create a jury question as to whether a battery had occurred.  *Id.*; *see also Brewer v. Petroleum Suppliers, Inc.*, 946 F. Supp. 926 (N.D. Ala. 1996) (evidence co-worker pinched plaintiff's buttocks and touched her breasts was sufficient to state a claim against the employer for assault and battery under Alabama law).  Here, plaintiff has presented evidence that Omodue grabbed and slapped her buttocks, cornered her and proposed to impregnate her, and pinned her against a wall and ran his hands over her body.[135]  Plaintiff has presented far more than ample evidence to create a genuine issue of material fact as to whether Omodue's conduct constituted assault, battery, or both.

### iii.    Invasion of privacy

Plaintiff asserts Omodue tortiously invaded her privacy.  Gates, in addition to

---

[135] Mullins Deposition, at 62-63, 67-69, 83, 78-80, 90-94.

reasserting that it cannot be liable for Omodue's actions, also argues that Omodue's actions "do not rise to the requisite level required to prove an invasion of privacy claim."

Invasion of privacy "consists of four distinct wrongs: 1) the intrusion upon the plaintiff's physical solitude or seclusion; 2) publicity which violates the ordinary decencies; 3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and 4) the appropriation of some element of the plaintiff's personality for a commercial use." *Gary v. Crouch*, 867 So. 2d 310, 318 (Ala. 2003) (quoting *Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705, 708 (Ala. 1983)) (internal quotation marks omitted). Plaintiff asserts only the first variety. Under Alabama law, to prove an intrusion upon seclusion, a plaintiff must demonstrate: "(1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Ex parte Atmore Community Hospital*, 719 So. 2d at 1194. The Alabama Supreme Court has found "intrusive and coercive sexual demands" to constitute the variety of intrusion into private matters that may be actionable under the tort. *Phillips*, 435 So. 2d at 709. As the Eleventh Circuit has recognized, "the Alabama Supreme Court has held that severe sexual harassment can be an invasion of privacy." *Armstrong v.*

*Standard Furniture*, 197 Fed. Appx. 830, 834 (11th Cir. 2006); *see also Stevenson v. Precision Standard, Inc.*,  762 So. 2d 820, 826 (Ala. 1999) ("[I]n *Phillips* . . . this Court recognized a cause of action for invasion of privacy stemming from sexual harassment.") (internal citations omitted).  One federal court reviewing Alabama invasion of privacy law in this context has noted that, even though "the mere fact of a touching does not, of itself, create a jury issue as to whether an invasion of privacy has occurred," evidence of particularly egregious touching, "supplemented with evidence  . . . of verbal conduct, including various requests for sexual favors [or] comments about a plaintiff's sexual parts," may create a fact issue sufficient to preclude summary judgment on an invasion of privacy claim. *Burden v. International Longshoremen's Association, Local # 1410*, 510 F. Supp. 2d 618, 628 (S.D. Ala. 2007).

Here, plaintiff has presented evidence of multiple sexual propositions and comments about plaintiff's body parts, as well as several instances of physical groping of sensitive parts of her anatomy.  The conduct here is significantly more intrusive than what the Alabama Supreme Court found sufficient to create a jury issue about an invasion of privacy claim in *Ex parte Atmore Community Hospital*.  719 So. 2d at 1194 (finding "several lewd comments," a request that plaintiff "meet [defendant] outside of work hours for other than business purposes," and "evidence

indicating that [defendant] looked up [plaintiff's] skirt on more than one occasion" sufficient to survive summary judgment on a sexual-harassment-premised intrusion upon seclusion claim).   More crucially, unlike in *Ex parte Atmore Community Hospital*, Gates has nowhere argued that the conduct constituting invasion of privacy ceased after Gates complained, thereby providing a basis for arguing that it could be relieved from liability for any tortious acts of its agent.[136]   *Id.* at 1195.   Gates is, therefore, not entitled to summary judgment on plaintiff's state law invasion of privacy claim.

### iv.    Outrage

In count IV, plaintiff asserts Omodue's actions constituted the tort of outrage under Alabama law, and that Gates is liable for that tort as well.[137]   Gates contends — as it does with respect to the assault, battery, and invasion of privacy claims — that it did not ratify the conduct and that the conduct does not rise to the level of the tort of outrage.   Moreover, and uniquely with respect to this claim, Gates also contends that it "was not aware that any conduct constituted outrage . . . ."

"In order to prevail on a tort-of-outrage claim, a plaintiff is required to prove that the defendant's conduct:  '(1) was intentional or reckless; (2) was extreme and

---

[136] *See* doc. no. 25, at 28.

[137] Doc. no. 5, ¶¶ 47-52.

outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'" *Soti v. Lowe's Home Centers, Inc.*, 906 So. 2d 916, 919 (Ala. 2005) (quoting *Harrelson v. R. J.*, 882 So. 2d 317, 322 (Ala. 2003)) (citations omitted).  Recovery under the tort of outrage is available only with respect to "'conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Travelers Indemnity Co. of Illinois v. Griner*, 809 So. 2d 808, 810 (Ala. 2001) (quoting *American Road Service Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980)) (citations omitted).  As Gates correctly notes, "[t]he tort of outrage is an extremely limited cause of action." *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000). However, "egregious sexual harassment" is among the "only three kinds of conduct" the Alabama Supreme Court has explicitly held may constitute outrage.  *Id.* (citing *Busby v. Truswal Systems Corp*., 551 So. 2d 322 (Ala. 1989)).

Gates' reliance (to the extent it can be discerned from the scant page in their brief devoted to the outrage claim) upon two decisions by federal district courts finding insufficient evidence to support a claim of outrage under Alabama is misplaced.[138]  In both cases, the plaintiffs had submitted evidence of, at most, one instance of allegedly offensive physical conduct against each co-worker defendant.

---

[138] Doc. no. 25, at 29.

*See Burden*, 510 F. Supp. 2d at 620, 625-27; *Durham v. Philippou*, 968 F. Supp. 648, 651-53 (M.D. Ala. 1997).  By contrast, this court has previously noted that, while "kitchen-sink" inclusion of outrage claims in complaints alleging sexual harassment is generally discouraged, repeated, unwanted touchings "go[] beyond the simply base and overstep[] the tolerable bounds of a civilized society." *Brewer*, 946 F. Supp. at 936 (citing *Busby*, 551 So. 2d at 324).  The Alabama Supreme Court held, in *Busby,* that a pattern of graphic remarks, gestures, and touchings amounting to seventeen occurrences in total was sufficient to support an outrage claim.  *Busby*, 551 So. 2d at 324.  Plaintiff alleges a pattern of more than thirty incidents, including  several physical, and physically intimidating, incidents.  Moreover, many of the verbal comments are at least as egregious and, thus, "utterly intolerable in civilized society" as those the *Busby* plaintiffs endured.  *Compare* doc. no. 23, Ex. 2, at 4-5, *with Busby*, 551 So. 2d at 324 (detailing the conduct evidenced through deposition testimony that the court found sufficient to create a jury question as to the tort of outrage).  Consequently, this court is unable to say that, as a matter of law, the evidence of physical and verbally harassing conduct here falls below the level of repugnance required to support an outrage claim under Alabama law.

However, *Busby* also suggests that, with respect to the liability of an employer for the outrageous conduct of an employee, as higher level of notice may be required

than for other intentional torts. *Id.* at 327. Indeed, the court in that case held that, while the employer could be held liable for its employee's conduct under a theory of invasion of privacy, the same was *not* true under the plaintiff's outrage claim. *Id.* at 327-28. This appears to be the basis of Gates' contention that it was "not aware that any conduct constituted outrage," though Gates neither cites *Busby* nor pursues the brief reference any further.[139]   Nonetheless, even if Gates had adequately made the argument that notice was insufficient to apprise it that Omodue's conduct constituted outrage, subsequent decisions indicate that any differences in liability between different torts based upon the level of conduct about which an employer was notified have been eliminated after *Potts*. *See Machen*, 761 So. 2d at 985 (applying, to a claim of outrage against an employer based upon an employee's conduct, the same standard of actual knowledge of the conduct, knowledge that it constituted a continuing tort *or* sexual harassment, and failure to take adequate remedial steps, applicable to other torts based upon alleged sexual harassment) (quoting *Potts*, 604 So. 2d at 400); *see also id.* at 985 n.3 (indicating that there is a *different standard for ratification*, even with respect to outrage, when the underlying conduct involves sexual harassment).

---

[139] Doc. no. 25, at 29. *See N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir.1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived."); *Continental Technical Services v. Rockwell International Corp.*, 927 F.2d 1198, 1199 (11th Cir.1991) (finding that a "simple contention" does not present an argument and therefore is waived).

It appears to this court that, under Alabama law, the notice standard enunciated in *Potts* — requiring only that an employer have known of the conduct and known that it "constituted sexual harassment" — applies also to the tort of outrage. *E.g.*, *id.* Similarly, since Omodue's conduct did not abate after Gates was notified, under the *Potts* standard, Gates' remedial measures cannot be viewed as adequate as a matter of law. Plaintiff has produced sufficient evidence to raise a genuine issue as to whether Omodue subjected her to sexually offensive conduct rising to the level of the tort of outrage under Alabama law and as to the existence of a legal basis for Gates' liability for that conduct. Accordingly, Gates is not entitled to summary judgment on the outrage claim in count IV of plaintiff's complaint.

### b. Negligent and/or wanton hiring, supervision, training, and/or retention

Finally, plaintiff asserts in count V that Gates negligently or wantonly hired and retained, and/or failed to adequately supervise and train Omodue, which proximately caused the sexual harassment plaintiff claims to have endured.[140]

### i. Negligent training and supervision

The Supreme Court of Alabama has defined the standards for proving a tort of negligent supervision in the following manner:

> In the master and servant relationship, the master is held

---

[140] Doc. no. 5, ¶¶ 53-57.

> responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence. This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care must have had them brought to his notice. While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

*Armstrong Business Services. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001) (quoting *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala. 1993) (quoting *Lane v. Central Bank of Alabama, N.A.,* 425 So. 2d 1098, 1100 (Ala. 1983) (in turn quoting *Thompson v. Havard*, 235 So. 2d 853, 858 (Ala. 1970)))). The same principles apply to plaintiff's claim for negligent training. *See Pritchett v. ICN Medical Alliance, Inc.*, 938 So. 2d 933, 940 (Ala. 2006) ("After reviewing Alabama caselaw, we see no distinction between claims of wrongful supervision and claims of wrongful training.") (quoting *Zielke v. AmSouth Bank, N.A.*, 703 So. 2d 354, 357-58 n.1 (Ala. Civ. App. 1996)). The court concludes plaintiff has produced sufficient evidence to preclude summary judgment on this claim.

As previously noted, plaintiff testified that she first complained about Omodue's behavior towards her to Jim Shockley, the supervisor designated in Gates' sexual harassment policy,[141] in January of 2007, more than a year before she left Gates.[142]  On at least four other occasions over the course of the ensuing year, she again complained to a supervisory authority.[143]  Yet, even after plaintiff complained, the alleged harassment did not abate.  *See Sears v. PHP of Alabama, Inc.,* No. 2:05CV304-ID, 2006 WL 932044, at *21 (M.D. Ala. April 10, 2006) (finding a jury question with regard to negligent training and supervision when the offending employee continued to engage in offensive behavior after being reprimanded by management and transferred off the plaintiff's shift, even though the offensive behavior was less frequent and less severe than before); *Machen*, 761 So. 2d at 987. Gates, however, asserts that it "took prompt steps to end any alleged tortuous [sic]

---

[141] Shockley Deposition, at 24-26; *id.*, Plaintiff's Exhibit 4.

[142] Doc. no. 25, ¶ 11; Mullins Deposition, at 59-60.

[143] Doc. no. 25, ¶¶ 14, 19, 28.  Mullins testifies that she made five complaints over the course of her time at Gates.  *See* Mullins Deposition, at 74 ("[T]here was five complaints written." [sic]). *See also*, doc. no. 25, at 23 n.12 (describing five separate complaints).  Nonetheless, throughout its brief, Gates regularly addresses *only* the last complaint, without explanation.  Plaintiff's first complaint, in January 2007, was consistent with the instructions in Gates' sexual harassment policy. *See id.* at 3, ¶ 8.  Moreover, Gates never expressly makes the argument that any of these prior complaints, even those made to supervisors not designated on the company's sexual harassment poster, were ineffective to apprise the company of the harassment plaintiff alleges.  *See id.*, at 23 n.12.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties . . . are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted . . . .").

conduct and there was no more alleged harassment."[144]  Yet Gates, correctly, confines this assertion to the final incident on January 24.  It does not contend that it investigated any of the prior complaints or took any steps whatsoever, other than moving plaintiff, to address the conduct alleged in those complaints with Omodue.

Rather, Gates asserts that plaintiff's negligent training and supervision claims must fail because the conduct alleged "does not meet the level of severe or pervasive for sex [sic] harassment under Title VII."  Gates provides no authority for the proposition that the legal standards for negligent supervision or training under Alabama and one prong of a hostile work environment claim under 42 U.S.C. § 2000e should be conflated.  None of the four decisions Gates cites in its brief in support of its motion for summary judgment and reply brief support its position.  One decision does not even address state law negligent supervision or training claims at all.[145]  In another, Gates cites only the court's discussion of the applicability of the *Faragher-Ellerth* defense under Title VII, ignoring the portion of the opinion upholding summary judgment on the pendent negligent supervision claims against the employer because there had been no harassing behavior whatsoever after the plaintiff complained to her employer.  *Baldwin v. BlueCross/Blue Shield of Alabama*, 480

---

[144] Doc. no. 25, at 30.

[145] *See* doc. no. 36, at 10 (citing *Farley v. Am. Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 2007), in which the district court's discretionary dismissal of the pendent state law claims was not even attacked on appeal).

F.3d 1287, 1305 (11th Cir. 2007) (the cited portion, dealing exclusively with the Title VII claims);[146] *id.* at 1309 (addressing the Alabama law negligent supervision claim). *Jackson v. Cintas* held the plaintiff's negligent training and supervision claims foreclosed because the employer had no notice and, moreover, *expressly reiterated* the significant distinctions between the analysis under Title VII and that under Alabama law. 391 F. Supp. 2d 1075, 1100-01 (M.D. Ala. 2005). The last decision Gates cites is affirmatively antagonistic to their position. In *Machen*, the Alabama Supreme court found that evidence showing that no "follow-up investigation" had been conducted, no discipline had been visited on the offending employee, and that the tortious conduct had continued after a complaint was made, *precluded summary judgment*. 761 So. 2d at 987. Gates, however, does not even contend it began an investigation until after the January 24, 2008 incident, more than a year after Mullins testified she made her first complaint.

Based on this evidence, a reasonable jury could conclude that, "had [Gates ] monitored and/or supervised the situation more carefully, [Omodue] would not have repeated the acts of misconduct." *Sears,* 2006 WL 932044, at *21. Thus, a genuine issue of material fact exists with regard to whether Gates was negligent in training and supervising Omodue, and whether the negligence resulted in plaintiff being

---

[146] *Id.* at 9-10.

subjected to additional harassing behavior.  Gates' motion for summary judgment on plaintiff's negligent training and/or supervision claim is due to be denied.

### ii.      Negligent hiring

Courts evaluating negligent hiring claims have considered such factors as whether the employer performed a background check or otherwise evaluated the employee before hiring him, and whether the employer had knowledge of any prior incidents involving the hire.  *See, e.g., Big B,* 634 So. 2d at 1003.  Here, there is no evidence that, when Gates hired Omodue, it had any knowledge that he would be likely to engage in harassing behavior, or that Gates failed to exercise reasonable care to discover such information had it existed.  Moreover, plaintiff's response to Gates' motion for summary judgment makes no mention whatsoever of the negligent hiring, making it apparent that she has abandoned this claim.[147]  Accordingly, summary judgment is due to be granted on plaintiff's claim for negligent hiring.

### iii.      Negligent retention

A negligent retention claim under Alabama law provides a remedy to an employee who is injured by another employee, when such injury proximately results from "the negligence of the employer in retaining [an incompetent or potentially dangerous employee] with knowledge of his incompetence and the danger incident

---

[147] *See* doc. no. 33, at 28-31.

to his retention." *McDuff v. Kurn,* 172 So. 886, 887 (Ala. 1937) (citations omitted). In other words, "[a]n employer 'must use due care to avoid the . . . retention of an employee whom [the employer] knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons [with whom he will have contact at his place of employment].'" *Norman v. Southern Guaranty Insurance Co.,* 191 F. Supp. 2d 1321, 1337-38 (M.D. Ala. 2002) (quoting *Brown v. Vanity Fair Mills,* 277 So. 2d 893, 894 (Ala. 1973)).  To recover, "a plaintiff must show breach of the employer's above duty and that such breach proximately caused the plaintiff's injury." *Norman,* 191 F. Supp. 2d at 1338 (citing *Brown,* 277 So. 2d at 894).

The evidence adduced would permit a jury to determine that Gates became aware of Omodue's behavior (and the resulting potential danger of harassment for plaintiff and other female employees) when Newland complained to Jim Shockly that Omodue had grabbed her and pushed her back towards a row of drycleaning machines while grabbing at her breasts.[148]  Further, plaintiff submits evidence that nearly all of the incidents of harassment to which she testified happened after plaintiff's first complaint.[149]  A jury could conclude that all of these incidents

---

[148] Newland Deposition, at 14-16.  There is evidence it may have been sooner, but that is indefinite as to time.  Doc. no. 33, Ex. 1, at 21-26 (deposition of Susan Black) ("[Ms. Riley]:  Have you heard or overheard any of the supervisors talking about Mr. Omodue's behavior or words? [Ms. Black]: I think so.").

[149] *See* Mullins Deposition, 61-63 (stating that Mullins first complaint to Shockley was in January of 2007, after the first incident of alleged harassment she describes).

occurred as a result of Gates' retention of Omodue as an employee even after plaintiff's and Newland's complaints about Omodue's physically threatening behavior. *See Sears*, 2006 WL 932044 at *22 (finding a genuine issue of material fact on a negligent retention claim when the offending employee continued to engage in harassing behavior even after plaintiff complained to her immediate supervisor, and after the employee transferred off of plaintiff's work shift); *Mills,* 990 F. Supp. at 1390-91 (finding a genuine issue of material fact on a negligent retention claim when the offending employee continued to engage in harassing behavior even after the company met with him, warned him not to engage in future conduct, threatened to fire him if he did, and transferred him to another location); *Machen,* 761 So. 2d at 987 ("A jury could conclude had the [company] properly investigated the incident, they would not have allowed [the offending employee] to remain" in his position). Accordingly, summary judgment will be denied as to plaintiff's claim for negligent retention.

### iv.    Wantonness

Plaintiff also alleges that Gates was wanton in its hiring, training, supervision, and retention of Omodue.

> In *Alfa Mutual Insurance Co. v. Roush,* 723 So. 2d 1250, 1256 (Ala. 1998), [the Alabama Supreme Court] stated: "To prove wantonness, it is not essential to prove that the defendant entertained a specific design

or intent to injure the plaintiff." "Wantonness" is defined by statute as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala. Code 1975, § 6-11-20(b)(3). In *Roush,* citing *Bozeman v. Central Bank of the South,* 646 So. 2d 601 (Ala. 1994), [the Alabama Supreme Court] described wantonness as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Roush,* 723 So. 2d at 1256.

*Machen*, 761 So. 2d at 987.

In the context of sexual harassment cases, the Alabama Supreme Court has allowed a wantonness claim to proceed to the jury when the evidence showed that the employer *consciously* downplayed a prior incident of sexual harassment in order to retain the offending employee, knowing that doing so would likely give the offender an opportunity to harass again. *See Big B, Inc.,* 634 So. 2d at 1004. The court also reached a similar holding when the evidence demonstrated that the employer, a bank, "consciously chose to minimize the situation" in order to protect the offending employee, who was the bank's president and Chief Operating Officer, and the brother of the bank's Chief Executive Officer. *Machen,* 761 So. 2d at 987-88. *See also Ex parte Essary*, 992 So. 2d 5, 12 (Ala. 2007) (reversing denial of summary judgment on a wantonness claim because there was no evidence defendant's "state of mind contained the requisite consciousness, awareness, or perception that *injury was likely to*, or *would probably*, *result*") (emphasis in original); *Ferguson v. Baptist Health*

63

*Systems Inc.*, 910 So. 2d 85, 92 (Ala. 2005) ("While a party claiming wantonness does not have to prove an intent to injure . . . wantonness requires proof of some degree of conscious culpability.") (citing *Yamaha Motor Co. v. Thornton*, 579 So. 2d 619, 623 (Ala. 1991)); *Roberts v. Brown*, 384 So. 2d 1047, 1048 (Ala. 1980) ("The most crucial element of wantonness is knowledge.").

Here, there is no evidence that Gates consciously disregarded any prior misconduct and consciously disregarded a known and substantial likelihood that doing so would likely result in his harassment of plaintiff. *Ex parte Essary*, 992 So. 2d at 9 ("'Wantonness' has been defined by this Court as the conscious doing of some act or the omission of some duty while knowing of the existing conditions *and* being conscious that, from doing or omitting to do an act, injury will likely or probably result.") (citing *Bozeman v. Central Bank of the South*, 646 So. 2d 601 (Ala. 1994)). Plaintiff relies exclusively upon the Alabama Supreme Court's determination that summary judgment was not available as to a claim of wanton supervision, training, and/or retention in *Machen* because the employer had simply required the alleged harasser to read the company's sexual harassment policy upon a second complaint of harassing conduct, rather than carrying through with the dismissal it had threatened. *Machen*, 761 So. 2d at 988. Plaintiff points to the fact that Newland testified in her deposition that, following the incident of harassment by Omodue that she describes,

she recalled Jim Shockley telling Omodue "not to mess with [Newland] or he was going to be fired from his job."[150]  Plaintiff's reliance upon *Machen* in this instance, however, is misplaced.  The sentence in *Machen* immediately following that to which plaintiff refers states that "[a] jury could conclude from the *unique circumstances of this case (especially the prominence of the alleged perpetrator*) that the [employer] *consciously chose to minimize* the situation." *Id.* (emphasis supplied).  Plaintiff has presented no evidence Gates' failure to fire Omodue as it may have threatened *consciously ignored* the threat that he would harass (or continue to harass) plaintiff in order to derive some benefit from his continued employment, as was the case in *Machen*.  Rather, while Gates' actions in simply moving plaintiff between divisions may have fallen below the standard of care, that they in fact took some action strongly indicates the lack of a conscious or reckless disregard that plaintiff would be harassed.[151]  Beyond reiteration of the same assertions made with respect to her claims for *negligent* hiring, supervision, training, and/or retention, plaintiff has submitted no evidence to counter this inference from the record.  *See Ex parte Essary*, 992 So. 2d at 9 ("'Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort

---

[150] Newland Deposition, at 19.

[151] *E.g.*, Mullins Deposition, at 69 ("They kept moving me, but it didn't do no good.").

concepts of actionable culpability.") (quoting *Tolbert v. Tolbert*, 903 So. 2d 103, 114-115 (Ala. 2004)) (internal quotations omitted).

Further, as noted above, plaintiff appears to have abandoned her claim for wanton hiring.  In short, plaintiff has produced no evidence to support her claims that Gates acted wantonly in hiring, training, supervising, or retaining Omodue. Accordingly, summary judgment is due to be granted as to these claims.

## IV. CONCLUSIONS AND ORDERS

In accordance with the foregoing, Gates' motion to strike plaintiff's errata sheet is due to be, and the same is hereby, DENIED.  Further, Gates' motion for summary judgment is hereby GRANTED with respect to plaintiff's claims for wanton hiring, training, supervision, and retention and for negligent hiring under Alabama law, and those claims are, hereby, DISMISSED.  Gates' motion is DENIED as to plaintiff's claims under Title VII for hostile work environment sexual harassment and constructive discharge, and plaintiff's supplemental claims under Alabama law for assault and battery, invasion of privacy, and negligent training, supervision, and retention.

DONE and ORDERED this 30th day of September, 2010.

_____
United States District Judge

66